IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA, CHARLOTTE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| v. | : **COMPLAINT** |
| MARLIN S. HERSHEY, | : C.A. No.: |
| Defendant. | : |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**SUMMARY**

1.  Marlin S. Hershey ("Hershey" or "Defendant") engaged in illegal insider trading and tipping in connection with the securities of LendingTree, Inc. ("LendingTree"). Shortly before the May 5, 2003, public announcement that LendingTree was being acquired by USA Interactive at a substantial premium to LendingTree shareholders (the "Announcement"), Hershey was improperly tipped material, nonpublic information concerning the pending acquisition by his friend and business associate, Brian G. Paquette, then LendingTree's Vice President of Product Management. While in possession of this material, nonpublic information, Hershey purchased shares of LendingTree stock. Hershey also tipped this inside information, either directly or indirectly, to at least three other business associates who also purchased shares of LendingTree stock. After the Announcement, the price of LendingTree stock

soared, and Hershey and his tippees sold their shares. Hershey's unlawful profits totaled approximately $14,078, while his tippees' profits totaled at least $74,516.

2. By virtue of his conduct, Hershey violated the antifraud provisions of the Securities Exchange Act of 1934 (the "Exchange Act") (Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]). Unless enjoined, Hershey is likely to commit such violations again in the future.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter pursuant to Exchange Act Sections 21(d)(1), 21(e), 21A, and 27 [15 U.S.C. §§ 78u(d)(1), (e), 78u-1, and 78aa]. Venue is proper because certain acts or transactions constituting the violations occurred within this judicial district.

4. Defendant directly and indirectly made use of the means and instrumentalities of interstate commerce and the mails in connection with the conduct alleged herein.

## THE DEFENDANT

5. Marlin S. Hershey, age 37, resides in Cornelius, North Carolina. During the relevant period, Hershey was involved in various business ventures in Charlotte, North Carolina, including co-founding HCX, a hair salon franchise business.

## OTHER RELEVANT PERSONS AND ENTITIES

6. Brian G. Paquette, age 37, resides in New Jersey. During the relevant period, Paquette was LendingTree's Vice President of Product Management. On September 26, 2005, the Commission filed a civil enforcement action against Paquette. *See SEC v. Paquette, et al.*, 3:05CV412 (W.D.N.C.). On September 29, 2005, the District Court for the Western District of North Carolina entered a final judgment against Paquette, which among other things, enjoined Paquette from violating the antifraud provisions of the federal securities laws and ordered a civil penalty.

7.    LendingTree was a Delaware corporation, headquartered in Charlotte, North Carolina, that provided an online network where participating lenders competed for consumer-credit requests. At all relevant times, LendingTree's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act [15 U.S.C. §78k(g)], and quoted on the Nasdaq National Market System. On August 8, 2003, InterActiveCorp, formerly named USA Interactive, completed its acquisition of LendingTree. LendingTree is now a subsidiary of InterActiveCorp.

8.    USA Interactive is a Delaware corporation with its executive offices in New York, New York, that operates through its subsidiaries as a diversified media and electronic commerce company. At all relevant times, USA Interactive's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act [15 U.S.C. §78k(g)], and quoted on the Nasdaq National Market System. On June 23, 2003, USA Interactive changed its name to InterActiveCorp.

## STATEMENT OF FACTS

### Background

9.    On December 20, 2002, the Chief Executive Officer ("CEO") of USA Interactive, and other members of the senior management of USA Interactive, met with the CEO of LendingTree, as well as members of LendingTree's Executive Committee, at LendingTree's headquarters to discuss business transactions between the two companies.

10.   In February 2003, senior management of LendingTree and USA Interactive began to discuss a possible merger of the two companies.

11.   On April 16, 2003, LendingTree's Board of Directors accepted a tentative offer from USA Interactive pursuant to which USA Interactive would exchange shares of its common stock for each outstanding share of LendingTree's common stock.

3

12. Over the next two to three weeks, USA Interactive completed due diligence and worked on finalizing the terms of the merger, obtaining board approvals, and preparing the joint press release for the Announcement.

13. Before trading opened on Monday, May 5, 2003, LendingTree and USA Interactive announced that the two companies had signed a binding merger agreement whereby USA Interactive agreed to exchange .6199 shares of its common stock for each outstanding share of LendingTree's common stock. The exchange effectively valued LendingTree stock at $21.67 per share -- a substantial premium over the $14.69 per share closing price of LendingTree on May 2, 2003.

14. Following the Announcement, LendingTree's stock opened at $21.30 per share -- up more than 44% -- from its previous trading day's closing price of $14.69. LendingTree's stock reached a high of $21.36 that day, closing at $20.72 on extremely heavy volume.

## Paquette's Duty to LendingTree

15. Paquette owed a duty of trust and confidence to LendingTree and its shareholders not to improperly use or disclose material, nonpublic information.

16. Over the course of his employment at LendingTree, Paquette was provided with copies of LendingTree's policies on insider trading and the protection of confidential information (as well as revisions and updates to those policies), and repeatedly signed affirmations acknowledging that he had read, understood, and agreed to comply with those policies.

17. LendingTree's insider trading policy prohibited employees from, among other things, disclosing material, nonpublic information. Furthermore, the policy defined information as "material" to include those circumstances where a "reasonable investor would consider it important in arriving at a decision to buy, sell, or hold securities." In fact, the LendingTree insider trading policy specifically identified news of a proposed acquisition as an illustrative example of material, nonpublic information.

4

Moreover, the policy prohibited employees from using any proprietary, confidential, or nonpublic information of any kind acquired as a result of their association with LendingTree.

### The Relationship Between Hershey and Paquette

18. Hershey and Paquette were friends and business associates. In 1988, Hershey enrolled at Bryant College where he befriended and roomed with Paquette. After graduating from college, Hershey and Paquette remained close friends and both eventually resided in the Charlotte, North Carolina area. In June 2002, Paquette went to work for LendingTree, where he worked in the company's Product Management Group. By late April 2003, Paquette was promoted to Vice President of Product Management.

19. In addition to being long time friends, Hershey and Paquette had private business dealings. In 2002, Hershey co-founded a hair salon franchise business in which Paquette became an investor. Moreover, in April 2003, Paquette and other LendingTree colleagues formed a company, PLP Partners, LLC ("PLP"), to make commercial real estate investments. In May 2003, Hershey referred to PLP a commercial real estate investment opportunity, a shopping center in Scottsdale, Arizona, which PLP ultimately purchased.

### Paquette Tips Hershey About the Pending Acquisition of LendingTree

20. By late April 2003, Paquette had learned from other LendingTree executives that LendingTree was engaged in negotiations to be acquired, which was material, nonpublic information.

21. Subsequently, while on a golf trip with Hershey and others in Myrtle Beach, South Carolina in late April 2003, and in breach of his duty to LendingTree and its shareholders, Paquette tipped Hershey that LendingTree may be acquired.

22. Subsequently, on or about May 1, 2003, Paquette was told by other LendingTree executives, additional material, nonpublic information concerning the pending acquisition. Paquette was

5

told that USA Interactive was going to acquire LendingTree, and that the purchase price was going to be approximately $20 or $21 a share. Later that evening, in breach of his duty to LendingTree and its shareholders, Paquette called Hershey and tipped him this additional material, nonpublic information concerning the pending acquisition.

23. Hershey knew, or should have known, that Paquette tipped Hershey this material, nonpublic information in breach of Paquette's duty of trust and confidence to LendingTree and its shareholders.

### Hershey Trades on the Inside Information

24. On April 29, 2003, after Paquette tipped Hershey material, nonpublic information that LendingTree may be acquired, Hershey called his broker at Merrill Lynch and placed an order to purchase 250 shares of LendingTree in his IRA. Hershey's order was filled at $14.37 per share for a total purchase price of $3,592.50.

25. On May 2, 2003, after Paquette tipped Hershey additional material, nonpublic information that LendingTree was going to be acquired by USA Interactive at purchase price of approximately $20 or $21 a share, Hershey again called his broker and placed an order to purchase an additional 1,500 shares of LendingTree in his IRA account, and 500 shares of LendingTree in his brokerage account. Hershey's orders were filled at $14.80 per share, for a total purchase price of $29,600.

### Hershey Tips Others Who Trade on the Inside Information

26. In addition to trading on the inside information he received from Paquette, Hershey also tipped, directly or indirectly, this material, nonpublic information concerning the pending acquisition to at least four other individuals (Tippees A, B, C, and D).

27. Hershey and Tippees A, B, C, and D were all business associates at HCX, the hair salon franchise business co-founded by Hershey.

28. Between April 29 and May 1, 2003, Hershey tipped material, nonpublic information concerning the pending acquisition of LendingTree to Tippee A.

29. Between April 29 and May 1, 2003, Hershey also tipped material, nonpublic information concerning the pending acquisition to Tippees B, C and D, either directly, and/or indirectly through Tippee A.

30. On or about May 1, 2003, Tippees B and C went together to the Merrill Lynch branch office in Omaha, Nebraska, sold the existing securities in their IRA accounts at Merrill Lynch, and purchased, respectively, 690 and 450 shares of LendingTree stock in their IRA accounts, at a price of approximately $14 per share.

31. Later that same day, Tippee C also returned to the Merrill Lynch branch office, opened a new brokerage account, and purchased an additional 2,400 shares of LendingTree stock, at a price of approximately $14 per share.

32. Also that same day, Tippee D went to the same Merrill Lynch branch office in Omaha, opened a brokerage account, and purchased 8,000 shares of LendingTree, at a price of approximately $14.70 per share.

### Hershey's and His Tippees' Trading Profits

33. On May 5, 2003, immediately following the Announcement, Hershey and Tippees B, C and D each sold the LendingTree stock they had acquired only days before, at an average sale price of approximately $21 per share. Hershey's illicit trading profits totaled approximately $14,078. The trading profits of Hershey's tippees totaled at least $74,516.

## CLAIM FOR RELIEF

### Insider Trading

### Violations of Exchange Act Section 10(b) and Exchange Act Rule 10b-5

34. Paragraphs 1 through 33 are realleged and incorporated by reference.

35. Prior to the May 5, 2003 Announcement, information concerning the pending acquisition of LendingTree was both material and nonpublic.

36. Prior to the May 5, 2003 Announcement, Paquette tipped Hershey material, nonpublic information concerning the pending acquisition of LendingTree.

37. Hershey knew, or should have known, that Paquette tipped Hershey this material, nonpublic information in breach of Paquette's duty of trust and confidence to LendingTree and its shareholders.

38. Prior to the May 5, 2003 Announcement, while in possession of material, nonpublic information concerning the pending acquisition of LendingTree, Hershey purchased a total of 2,250 shares of LendingTree stock.

39. Prior to the May 5, 2003 Announcement, Hershey tipped, directly or indirectly, material, nonpublic information concerning the pending acquisition of LendingTree to Tippees A, B, C and D.

40. Prior to the May 5, 2003 Announcement, while in possession of material, nonpublic information concerning the pending acquisition of LendingTree, Tippees B, C and D purchased a total of 11,540 shares of LendingTree stock.

41. By reason of the foregoing, and in connection with the above-described purchases of LendingTree stock, Hershey violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment that:

(i) permanently enjoins Hershey from violating Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(ii) orders Hershey to disgorge, with prejudgment interest, all profits realized from the above-described trading in LendingTree stock;

(iii) orders Hershey to pay civil monetary penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]; and

(iv) grants such other and further relief as the Court deems just and appropriate.

Dated: September 27, 2007

Respectfully submitted,

*/s/ Jane M.E. Peterson*
Jane M.E. Peterson
Scott W. Friestad
Robert B. Kaplan
Brian O. Quinn
Robyn R. Bender

Attorneys for Plaintiff
Securities and Exchange Commission

SEC Division of Enforcement
100 F. Street, NE
Washington, DC 20549-5561

Tel. (202) 551-4468 (Peterson)
Fax (202) 772-9245 (Peterson)